## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JANE DOE,

       *Plaintiff*,

    v.

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL
EMPLOYEES,

       *Defendant*.

Civil Action No. 25‑3985 (SLS)

Judge Sparkle L. Sooknanan

## <u>MEMORANDUM OPINION</u>

Jane Doe initiated this action in the Superior Court of the District of Columbia against her former employer, the American Federation of State, County and Municipal Employees (AFSCME), raising various claims related to alleged incidents of sexual harassment. AFSCME removed the case to this Court, arguing that Ms. Doe's claims are preempted by the Labor Management Relations Act of 1947 (LMRA). Ms. Doe now asks this Court to remand the case to Superior Court because her claims arise under District law, not federal law. Although federal preemption is not usually grounds for removal, the LMRA is a unique statute that displaces state causes of action for enforcement of a collective bargaining agreement and replaces them with an exclusive remedy in federal courts—a doctrine known as "artful pleading" or "complete preemption." Because Ms. Doe's common-law claim of constructive discharge substantially depends on the terms of her collective bargaining agreement with AFSCME, it is preempted by the LMRA, making remand inappropriate. The Court expresses no view on the impact of the LMRA on Ms. Doe's other claims. But this case must proceed in federal court.

# BACKGROUND

### A.    Statutory Background

### 1.    Federal Question Jurisdiction

Federal courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. This grant of authority has long been construed using the well-pleaded complaint rule—that "[a] suit arises under the law that creates the cause of action." *Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260 (1916). "Thus, . . . a case may not be removed to federal court on the basis of a federal defense [alone], including the defense of pre-emption[.]" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (emphasis omitted). "The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Id.* at 392.

Yet there is a "corollary" to the well-pleaded complaint rule—the doctrine of "artful pleading" or "complete preemption." *District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 150 (D.C. Cir. 2023). Under this doctrine, "[a] complaint purporting to rest on state law . . . can be recharacterized as one 'arising under' federal law if the law governing the complaint is exclusively federal." *Vaden v. Discover Bank*, 556 U.S. 49, 61 (2009) (citing *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003)). This occurs when a federal statute's "pre-emptive force" is so "extraordinary" that corresponding "state law has been completely pre-empted" and "any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar*, 482 U.S. at 393 (cleaned up). When such a federal statute governs, "any 'claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law.'" *Exxon Mobil Corp.*, 89 F.4th at 150 (quoting *Anderson*, 539 U.S. at 8). In these cases, a plaintiff cannot "frustrate removal by

pleading the case without reference to any federal law," and removal is proper "even though no federal question appears on the face of the [plaintiff's] complaint." *Id.* (cleaned up).

The "doctrine does not abrogate the standard rule that a defense of preemption does not create federal question jurisdiction because it is not the defense of preemption that creates federal jurisdiction, but rather the inherently federal nature of the plaintiff['s] claim." *Renteria-Hinojosa v. Sunsweet Growers, Inc.*, 150 F.4th 1076, 1092 (9th Cir. 2025) (cleaned up). Removal is proper because the federal statute replaces "the state law cause of action with a federal cause of action." *Schmeling v. NORDAM*, 97 F.3d 1336, 1342 (10th Cir. 1996). The doctrine applies only where a "statute clearly manifest[s] that federal law" is intended to "wholly displace[] state law." *Exxon Mobil*, 89 F.4th at 150 (cleaned up). To date, the Supreme Court has found only three statutes to completely preempt state law in this manner: (1) Section 301 of the Labor Management Relations Act (LMRA), (2) Section 502(a) of the Employee Retirement Income Security Act (ERISA), and (3) Sections 85 and 86 of the National Bank Act. *Id.* (collecting cases).

The complete preemption doctrine has been criticized as lacking consistent application, missing an "analytic basis," and masquerading as an "unprecedented act of jurisdictional alchemy." *Anderson*, 539 U.S. at 14 (Scalia, J., dissenting); *see also* Arthur R. Miller, *Artful Pleading: A Doctrine in Search of Definition*, 76 Texas L. Rev. 1781 (1998); Gil Seinfeld, *The Puzzle of Complete Preemption*, 155 U. Pa. L. Rev. 537 (2007). Still, the Supreme Court has consistently upheld its application. *See Anderson*, 539 U.S. at 8. Today, "the complete preemption doctrine 'is applied primarily in cases raising claims pre-empted by [Section] 301 of the LMRA." *Searcy v. Smith*, 111 F.4th 111, 115 (D.C. Cir. 2024) (quoting *Caterpillar*, 482 U.S. at 393) (alteration in original).

### 2.    National Labor Relations Act

The LMRA is an amendment to the Wagner Act or National Labor Relations Act of 1935 (NLRA), 29 U.S.C. §§ 151–169. *Int'l Longshoremen's Ass'n v. NLRB*, 56 F.3d 205, 207 (D.C. Cir. 1995). The NLRA "establishes a federal regime for managing labor relations and generally authorizes the National Labor Relations Board (NLRB) to resolve disputes" regarding labor relations. *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 815 F.3d 834, 839 (D.C. Cir. 2016). The "NLRB's jurisdiction is in general exclusive," so "if a claim falls within the purview of the NLRB, state and federal courts are preempted from hearing it"—a doctrine known as "*Garmon* preemption." *Id.* (citing *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959)). *Garmon* preemption extends to "conduct 'that the NLRA protects, prohibits, or arguably protects or prohibits.'" *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023) (quoting *Wis. Dept. of Indus. v. Gould Inc.*, 475 U.S. 282, 286 (1986)).

Congress enacted the NLRA largely to curtail the role of judges in the field of organized labor and instead "entrust[] administration of the labor policy for the Nation to a centralized administrative agency," the NLRB, "armed with its own procedures, and equipped with its specialized knowledge and cumulative experience[.]" *Garmon*, 359 U.S. at 242.[1] In addition,

---

[1] The NLRA reflected a "fundamental change in the Nation's labor policies" as a reaction to "earlier notion[s]" held by judges "that union activity was a species of 'conspiracy' and . . . unreasonable restraints of trade[.]" *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 190 (1978). Prior to the NLRA, "federal-court intervention . . . through the use of injunctive powers against unions . . . had caused the federal judiciary to fall into disrepute among large segments of this Nation's population." *Jack. Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 715 (1982). In 1932, Congress sought "to correct the abuses that had resulted from the interjection of the federal judiciary" into labor "disputes" and enacted the Norris-LaGuardia Act to "severely [limit] the power of the federal courts to issue injunctions 'in any case involving or growing out of a[] labor dispute.'" *Boys Mkts, Inc. v. Retail Clerks Union, Loc. 770*, 398 U.S. 235, 251 (1970) (quoting 29 U.S.C. § 101). Shortly thereafter, in 1935,

Congress also sought to "avoid the[] diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies." *Garner v. Teamsters, No. 776*, 346 U.S. 485, 490 (1953).

### 3.    Labor Management Relations Act

The Taft-Hartley Act or "Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. §§ 141 *et seq.*, 'carve[s] out' an exception to" the "exclusive jurisdiction" of the NLRB. *Liberty Mar. Corp.*, 815 F.3d at 840 (quoting *Vaca v. Sipes*, 386 U.S. 171, 179 (1967)) (alteration in original). "Specifically, section 301(a) of the LMRA grants a federal district court jurisdiction over '[s]uits for violation[s] of contracts between an employer and a labor organization.'" *Id.* (quoting 29 U.S.C. § 185(a)). In doing so, "Congress deliberately chose to leave the enforcement of collective agreements 'to the usual processes of the law.'" *Charles Dowd Box Co. v. Courtney*, 368 U.S. 502, 513 (1962).[2] And "Section 301 confers federal court jurisdiction over suits for breach of collective bargaining agreements[.]" *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.*, 933 F.3d 751, 757 (D.C. Cir. 2019).

---

Congress enacted the NLRA, which adopted an even broader and more extensive regulatory scheme "to safeguard the right of employees to self-organization and to select representatives of their own choosing for collective bargaining or other mutual protection without restraint" or obstruction. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33 (1937); *see also* 29 U.S.C. § 151.

[2] The LMRA was enacted as part of a shift in "congressional emphasis . . . from protection of the nascent labor movement to the encouragement of collective bargaining," *Boys Mkts.*, 398 U.S. at 251, and the establishment of "orderly and peaceful procedures" for protecting "the legitimate rights" of "labor organizations," "employers" and "employees," alike, 29 U.S.C. § 141(b). The Act sought to mitigate certain "inequities" and "injustice[s]" that arose from the total prohibition of judicial involvement in labor law without "impair[ing]" labor's social gains under the Norris-LaGuardia Act and the NLRA[.]" *Jack. Bulk Terminals*, 457 U.S. at 718–19 & n. 18 (cleaned up). Specifically, Section 301 restored the judicial role when doing so furthers federal labor law by "enforc[ing]" collective bargaining agreements as opposed to the past "tendency of federal courts to enjoin strikes." *Id.* at 708.

By only carving out a federal cause of action from the NLRA's preemptive scope, 29 U.S.C. § 185(a), the statutory scheme still "wholly displaces the state-law cause of action through complete pre-emption," *Anderson*, 539 U.S. at 8. A "claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) (citation omitted). State courts are still permitted "to exercise concurrent jurisdiction" over Section 301 claims. *Courtney*, 368 U.S. at 507–508.[3] But "even in state court, any action to enforce an agreement within the scope of § 301 would be controlled by federal law" and truly arises under the "federal cause of action under § 301[.]" *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 23 (1983) (first citing *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 103–104 (1962); and then citing *Textile Workers v. Lincoln Mills*, 353 U.S. 448 (1957)).

Accordingly, "any state action" within the scope of Section 301 is "removable to federal district court, even if an otherwise adequate state cause of action were pleaded without reference to federal law." *Id.* at 24. As the Supreme Court has explained:

> [T]he substantive law to apply in suits under [Section] 301(a) is federal law, which the courts must fashion from the policy of our national labor laws. . . . The Labor Management Relations Act expressly furnishes some substantive law. It points out what the parties may or may not do in certain situations. Other problems will lie in the penumbra of express statutory mandates. . . . solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. . . . Federal interpretation of the federal law will govern, not state law. . . . But state law, if compatible with the purpose of [Section] 301, may be resorted to in order to find the rule that will best effectuate the federal policy. . . . Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights.

---

[3] Congress sought not to "limit, but [] expand, the availability of forums for the enforcement of contracts made by labor organizations." *Courtney*, 368 U.S. at 508.

*Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 560 (1968) (quoting *Textile Workers*, 353 U.S. at 456–57).[4] Based on this reasoning, courts apply complete preemption in LMRA cases. *See Anderson*, 539 U.S. at 7. And Section 301 of the LMRA "converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).

### B.    Factual Background

AFSCME hired Ms. Doe on February 1, 2023, as a full-time employee assigned to its Washington, D.C., national headquarters. Compl. ¶ 10, ECF No. 3-2. Her annual salary was $92,000, *id.*, and her employment was governed by a collective bargaining agreement (CBA), CBA, ECF No. 3-4. Ms. Doe alleges that beginning in May 2023, she experienced persistent and unwelcome sexual harassment by her assigned union steward and a male colleague. Compl. ¶ 34. She further alleges that after raising formal and informal concerns about the harassment, AFSCME failed to investigate or discipline the alleged perpetrators and instead engaged in a retaliatory campaign of exclusion and intimidation. Compl. ¶¶ 34, 67. For instance, Ms. Doe received a formal written reprimand for allegedly recording a workplace conversation, which included a warning that further misconduct may result in termination. Compl. ¶ 26. And when Ms. Doe received

---

[4] The Supreme Court has "understood § 301 as a congressional mandate to the federal courts to fashion a body of federal common law to be used to address disputes arising out of labor contracts." *Int'l Bhd. of Elec. Workers, AFL-CIO v. Hechler*, 481 U.S. 851, 856 (1987) (quoting *Allis-Chalmers*, 471 U.S. at 209). The "federal scheme" underlying the LMRA mandates that "substantive principles of federal labor law . . . be paramount" in the field of "collective bargaining." *Lucas Flour*, 369 U.S. at 104; *see also* 29 U.S.C. § 171(a) (It is the "policy of the United States" that the "sound and stable industrial peace and the advancement of the general welfare, health, and safety of the Nation and of the best interests of employers and employees can most satisfactorily be secured by the settlement of issues between employers and employees through the processes of conference and collective bargaining[.]"). So "Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Allis-Chalmers*, 471 U.S. at 209–10 (quoting *Lucas Flour*, 369 U.S. at 104).

benefit payments from the District of Columbia for unpaid medical leave under the District of Columbia Family and Medical Leave Act, D.C. Code § 32–507, AFSCME reduced her salary by the value of the benefits she received. Compl. ¶¶ 22, 30. As a result of these events, Ms. Doe resigned from AFSCME. Compl. ¶ 97.

### C.    Procedural Background

Ms. Doe filed this action against AFSCME on August 4, 2025, in D.C. Superior Court. Compl. 1–3, 26. She brings eight claims: (I) sexual harassment in violation of the D.C. Human Rights Act (DCHRA); (II) retaliation in violation of the DCHRA; (III) gender discrimination in violation of the DCHRA; (IV) hostile work environment in violation of the DCHRA; (V) violations of the D.C. Family and Medical Leave Act (DCFMLA); (VI) invasion of privacy; (VII) constructive discharge; and (VIII) violations of the D.C. Wage Payment and Collection Law (DCWPCL). Compl. ¶¶ 32–107. On November 17, 2025, AFSCME removed the action to this Court. Notice of Removal, ECF No. 3-1. On December 29, 2025, Ms. Doe moved for remand. Mot., ECF No. 7. This motion is fully briefed and ripe for review. Opp'n, ECF No. 18.

## LEGAL STANDARD

"A civil action filed in state court may only be removed to a United States district court if the case could originally have been brought in federal court." *Nat'l Consumers League v. Flowers Bakeries, LLC*, 36 F. Supp. 3d 26, 30 (D.D.C. 2014) (citing 28 U.S.C. § 1441(a)). When a plaintiff moves to remand, "the removing defendant bears the burden of proving that removal was proper[.]" *Simon v. Hofgard*, 172 F. Supp. 3d 308, 315 (D.D.C. 2016). The "[p]arties may submit evidence outside the pleadings, including affidavits, in support of their position." *Arenivar v. Manganaro Midatlantic, LLC*, 317 F. Supp. 3d 362, 367 (D.D.C. 2018) (citing *Walter E. Campbell Co. v. Hartford Fin. Servs. Grp., Inc.*, 48 F. Supp. 3d 53, 55 (D.D.C. 2014)). If "the propriety of removal is unclear," remand is generally favored. *Id.* (cleaned up). "When it appears that a district

court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court must remand the case[.]" *Republic of Venezuela v. Philip Morris Inc.*, 287 F.3d 192, 196 (D.C. Cir. 2002) (citing 28 U.S.C. § 1447(c)).

## DISCUSSION

The Supreme Court has remarked that "the preemptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.'" *Franchise Tax Bd. of State of Cal.*, 463 U.S at 23 (quoting 29 U.S.C. § 185(a)). But that is not all. The LMRA "extend[s] [well] beyond suits alleging contract violations," *Allis-Chalmers*, 471 U.S. at 209, and encompasses "suits by and against individual employees as well as between unions and employers," *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562 (1976). Section 301 preempts any state action that is "substantially dependent" on or "inextricably intertwined" with "analysis of the terms of an agreement made between the parties in a labor contract." *Searcy*, 111 F.4th at 115–16 (quoting *Allis-Chalmers*, 471 U.S. at 213, 220).[5]

But the LMRA does not preempt "state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Allis-Chalmers*, 471 U.S. at 212. If "the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation . . . does not require the claim" be brought under Section 301. *Searcy*, 111 F.4th at 115 (quoting *Livadas v. Bradshaw*, 512 U.S. 107, 124

---

[5] Federal labor law mandates preemption in these circumstances to avoid "[t]he possibility that individual contract terms might have different meanings under state and federal law[,]" which "would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Allis-Chalmers*, 471 U.S. at 210 (quoting *Lucas Flour*, 369 U.S. at 103–04). "Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law[.]" *Hechler*, 481 U.S. at 857–58 (quoting *Lucas Flour*, 369 U.S. at 103–4). LMRA preemption works to prevent this result. *See id.*

(1994)). Nor is it dispositive that the "CBA creates rights and duties similar or identical" to state law, *Meyer v. Schnucks Mkts., Inc.*, 163 F.3d 1048, 1051 (8th Cir. 1998), and a claim enforcing those CBA provisions would involve "the same factual considerations" as a corresponding state-law action, *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 408 (1988). "[A]s long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 preemption purposes." *Id.* at 409–10.[6]

Against this backdrop, the Parties dispute whether Section 301 of the LMRA preempts Ms. Doe's state-law action.[7] *See* Mot.; Opp'n. Ms. Doe argues that her claims arise under independent state law, not under Section 301. Mot. 5. And AFSCME argues that Section 301 preempts all Ms. Doe's claims, especially those for constructive discharge and payroll deduction. *See* Opp'n 15 n. 2. Whether a state-law discharge action is preempted by the LMRA depends substantially on how the claim is pleaded.[8] Of the eight causes of action in Ms. Doe's Complaint,

---

[6] Further, the fact that calculating damages may involve "the interpretation of a collective-bargaining agreement" also does not preempt an otherwise independent "state-law claim." *Lingle*, 486 U.S. at 413 n. 12. Although federal law "would govern the interpretation of the agreement" to calculate damages, such a "dispute" only "tangentially involving a provision of a collective-bargaining agreement" does not mandate removal. *Id.* (quoting *Allis–Chalmers*, 471 U.S. at 211).

[7] Even though the District of Columbia is not a state, the same "preemption principles apply to District of Columbia laws." *Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 326 (D C. Cir. 2014) (citing *Wash. Serv. Contractors Coal. v. District. of Columbia*, 54 F.3d 811, 813, 815 (D.C. Cir. 1995)). The Court will thus refer to this action as an action under state law.

[8] *Contrast Allis-Chalmers*, 471 U.S. at 219–20 (describing "unfair discharge" as a quintessential type of claim covered by § 301 that requires a court "to interpret the labor contract"); *O'Donnell v. Boggs*, 611 F.3d 50, 55 (1st Cir. 2010) (tort action challenging termination preempted when resolution required "interpreting the CBA's terms . . . concerning leaves of absence[.]"); *Atkins v. Praxair Inc.*, 182 F. App'x 724, 726–27 (9th Cir. 2006) (claim for wrongful termination in violation of public policy removed when the plaintiff alleged the defendant "breached the terms and conditions of the collective bargaining agreement" to support the claim); *Tifft v. Commonwealth Edison Co.*, 366 F.3d 513, 519 (7th Cir. 2004) (wrongful termination suit preempted when resolution involves determining whether the "Defendants failed to comply with the terms" of the CBA); *Medrano v. Excel Corp.*, 985 F.2d 230, 233 (5th Cir. 1993) (retaliatory discharge claim preempted when plaintiff "drew on the settlement provision of the CBA itself to

the Court is persuaded that the common-law constructive discharge claim clearly "depends upon the meaning of a collective-bargaining agreement" and is thus preempted by Section 301. *Lingle*, 486 U.S. at 405–6. The Court need not decide whether Ms. Doe's remaining claims are preempted; it may exercise supplemental jurisdiction over those claims even if they are not preempted. *See Anderson*, 539 U.S. at 8 n. 3. For now, the Court may not remand this case to Superior Court.

Under D.C. Law, "[a] constructive discharge occurs when the employer deliberately makes working conditions intolerable and drives the employee into an involuntary quit[,]" which can "suffice to bring a tort action[.]" *Darrow v. Dillingham & Murphy, LLP*, 902 A.2d 135, 138 (D.C. 2006) (cleaned up). Such a tort action may be based on a violation of public policy expressed in a state constitution, law, or regulation. *See Adams v. George W. Cochran & Co.*, 597 A.2d 28, 32 (D.C. 1991); *Davis v. Cmty. Alts. of Washington, D.C., Inc.*, 74 A.3d 707, 709 (D.C. 2013). But constructive discharge could also arise based on breach of a contract or tortious interference with a contract when the employment contract is not at-will but rather provides "for cause" protections. *See Brock v. Mut. Reps., Inc.*, 397 A.2d 149, 152–55 (D.C. 1979); *Bayatfshar v. ARINC, Inc.*, 961 F. Supp. 2d 206, 212 (D.D.C. 2013). Both theories are available to Ms. Doe because the CBA provides that a "discharge" of an employee for disciplinary reasons may "be imposed only for just cause." Art. 8, CBA at 8.

Ms. Doe does not appear to rely on breach of contract to support her constructive discharge claim, as her Complaint does not rely on the CBA's just-cause termination provision. The

---

establish a violation"), *with Lingle*, 486 U.S. at 407 ("retaliatory discharge claim" not pre-empted by § 301 when resolution involves "purely factual questions pertain[ing] to . . . the conduct and motivation of the employer" rather than "construing the collective bargaining agreement"); *Krashna v. Oliver Realty, Inc.*, 895 F.2d 111, 115 (3d Cir. 1990) ("wrongful discharge" claim not preempted when the claim is based only on retaliation for exercising state worker compensation rights and not anything "embodied in the collective bargaining agreement").

Complaint alleges that "[c]onstructive discharge is treated as the functional equivalent of an involuntary termination and may support a wrongful discharge claim, particularly when grounded in retaliation, discrimination, or violations of public policy[.]" Compl. ¶ 91. It adds that "[c]onstructive discharge is particularly appropriate where, as here, the Plaintiff alleges violations of anti-discrimination statutes and public policies enshrined in the DCHRA and DCFMLA." Compl. ¶ 96. If Ms. Doe's constructive discharge is based on a breach of the CBA, it is undoubtedly preempted by Section 301 of the LMRA. *See* 29 U.S.C. 185(a). But even if Ms. Doe intends to allege only a wrongful termination tort based on public policy, her constructive discharge claim is still "substantially dependent" on analysis of the CBA and thus preempted. *Searcy*, 111 F.4th at 115 (quoting *Allis-Chalmers*, 471 U.S. at 220).

In *Allis-Chalmers*, the Supreme Court expounded upon what it means for a state-law action to be "substantially dependent" upon or "inextricably intertwined" with the terms of a CBA. 471 U.S. at 213, 220. There, the plaintiff brought a tort action against his employer for "the bad-faith handling of an insurance claim." *Id.* at 203. The Court found preemption under Section 301 of the LMRA, explaining:

> [There was] a complex system of overlapping procedures to determine continuing eligibility to receive benefits. The manner in which claims were verified by physicians, and the procedures for canceling benefits, were also apparently established through the practice of the parties. Had this case gone to trial, a central factual question would have been whether the manner in which Lueck's claim was processed and verified had departed substantially from the standard manner of processing such claims under the contract. That question, of course, necessarily involves contract interpretation.

*Id.* at 218 n. 12 (citations omitted). Because these issues are "substantially dependent upon analysis of the terms of an agreement," the Court reasoned that Section 301 mandates that courts use federal law to resolve these questions arising from the CBA and state law was thus preempted. *Id.* at 220.

Here, "evaluation of" Ms. Doe's constructive discharge theory is also "inextricably intertwined with consideration of the terms of the labor contract." *Searcy*, 111 F.4th at 115 (quoting *Allis-Chalmers*, 471 U.S. at 213). Although Ms. Doe was careful not to reference specific CBA provisions in her Complaint, her constructive discharge arises, in part, from "[t]hreats of future termination, documented in an *unjustified* written reprimand"; "[r]etaliatory discipline based on *policies that were not properly . . . executed*"; and "[d]enial of full salary and failure to provide pay stubs or justification for *unauthorized deductions*[.]" Compl. ¶ 93 (emphasis added). Resolution of these issues "require[s] construing the collective bargaining agreement" for three reasons. *Lingle*, 486 U.S. at 407.

*First*, Ms. Doe alleges that her "continued employment" was made "untenable" because she received an "unjustified written reprimand." Compl. ¶ 93. This is connected to Article 8 of the CBA, which provides that a "written reprimand" may "be imposed only for just cause." Art. 8, CBA at 8. Although Ms. Doe does not reference the just-cause provision in Article 8 of the CBA, the determination of whether her reprimand was "justified" would clearly turn on whether the reprimand was authorized under that provision. Resolution of this issue thus "necessarily involves contract interpretation." *Allis-Chalmers*, 471 U.S. at 218 n. 12.

*Second*, Ms. Doe alleges that AFSCME made her employment "untenable" by making "unauthorized" salary deductions "based on policies that were not properly . . . executed." Compl. ¶ 93. Specifically, Ms. Doe alleges that AFSCME's "conduct in deducting [her] salary to retroactively offset DC Paid Leave benefits . . . is improper, arbitrary, and retaliatory." Compl. ¶ 30. Fundamentally, this claim, too, is a contract dispute regarding the CBA. When making the challenged deductions, AFSCME reasoned that the deductions were authorized by Article 25.10 of the CBA because they offset separate "accrued sick and vacation leave" benefits that Ms. Doe

received in addition to her unpaid leave. Paula Caira Memorandum at 14–15, ECF No. 18-2. More specifically, AFSCME pointed to CBA provisions permitting deductions "from any AFSCME paid leave benefit" and stating that an employee's paid leave benefits shall not "exceed 100% of the employee's base salary." *Id.*; CBA at 37. At bottom, the success of Ms. Doe's constructive discharge claim depends on whether AFCSME properly relied on these provisions when making the deductions at issue. Indeed, Ms. Doe seeks "[a]n award of back pay and lost employment benefits, including wages, paid leave, retirement contributions, and other benefits lost as a result of the . . . wage deductions, and constructive discharge." Compl. ¶ D. And claims brought in state court to recover wages based on "the terms of a collective bargaining agreement" as opposed to an independent state legal obligation are preempted by Section 301. *Bush v. Clark Const. & Concrete Corp.*, 267 F. Supp. 2d 43, 44 (D.D.C. 2003).

*Third*, Ms. Doe admits that the wage deductions dispute at the center of her constructive discharge claim is "currently the subject of an internal grievance." Compl. ¶ 30. The procedures governing resolution of that grievance are dictated by Article 9 of the CBA. CBA at 9–11. Indeed, in support of her constructive discharge claim, Ms. Doe alleges:

> Plaintiff actively sought relief through internal grievance processes, engaged her union despite its initial indifference, complied with burdensome HR demands, and endured retaliation upon returning from medical leave. Nonetheless, the conditions did not improve and in fact worsened, demonstrating that the employer either intended the outcome or acted with deliberate disregard for Plaintiff's well-being and legal rights.

Compl. ¶ 95. Taken together, Ms. Doe's claim charges that the grievance procedure itself violated state law by failing to provide the wages she thinks are due (based upon her construction of the CBA) and thus made her "continued employment untenable." Compl. ¶ 93. But challenges to a CBA's grievance procedures and the fairness of union representation are the quintessential types of cases covered by Section 301, even if the union itself is not a defendant. *See Wince v. CBRE,*

*Inc.*, 66 F.4th 1033, 1039–40 & n.1 (7th Cir. 2023) (citing *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983)).

Ms. Doe seeks to sidestep this conclusion, arguing that whether her "discipline complied with contract" goes to the "Defendant's anticipated position" on the merits—*i.e.*, a federal defense that should not require the dismissal of her affirmative claim. Mot. 7. It is true that in removal cases, courts look to "the face of the complaint" to determine the nature of the plaintiff's claims. *Caterpillar*, 482 U.S. at 398–99. That the defendant may "ultimately prove that a plaintiff's claims are pre-empted" based on a federal defense in the answer "does not establish that" the action is "removable to federal court." *Id.* at 398. The question is whether the plaintiff "rel[ies] upon the collective agreement" either directly or "indirectly" in her pleadings. *Id.* at 395. But here, the answer to that question is a resounding yes—whether AFSCME's actions "complied with contract" was raised by Ms. Doe herself in her Complaint, not in any response by AFSCME. Mot. 7; *see* Compl. ¶ 93 (alleging that Ms. Doe was subject to "[r]etaliatory discipline based on policies that were not properly . . . executed").

\*       \*       \*

In sum, the resolution of Ms. Doe's constructive discharge claim is "'substantially dependent' upon and 'inextricably intertwined' with the terms of the CBA." *Searcy*, 111 F.4th at 116 (quoting *Allis-Chalmers*, 471 U.S. at 213, 220). Accordingly, removal to this Court was proper under Section 301 of the LMRA, 29 U.S.C. § 185(a). *See Lance v. Greyhound Lines, Inc.*, 244 F. Supp. 3d 147, 157–58 (D.D.C. 2017) (finding a constructive discharge and wrongful termination claim under D.C. law preempted by § 301). At this juncture, the Court need not decide if Ms. Doe's other claims are preempted by the LMRA because it exercises supplemental jurisdiction over them to the extent they are not preempted. *See Anderson*, 539 U.S. at 8 n. 3.

**CONCLUSION**

For these reasons, the Court denies the Motion to Remand, ECF No. 7. A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:   March 4, 2026